

## FACTORING AND SECURITY AGREEMENT

THIS FACTORING AND SECURITY AGREEMENT ("Agreement") is deemed executed at the offices of Purchaser in San Antonio, Bexar County, Texas and binding as of __05/18/2021__ by and between __Wire-Tech Manufacturing Corporation/Ancora Services Corporation.__ (below, "Seller") and **CR-FED, LLC**, a Texas limited liability company (sometimes below, "Purchaser" and sometimes below, "Factor").

1. **Definitions and Index to Definitions**. The following terms defined in this section shall have the following meanings. Each capitalized term not herein defined shall have the meaning set forth in the Uniform Commercial Code:

1.1 **"Account"** - in addition to the meaning given to this term by the UCC, the Seller and Purchaser acknowledge that this Agreement is intended to focus primarily, if not exclusively, on Seller's sale of Accounts arising from contracts for the sale of goods or performance of service or material or services furnished pursuant to or in compliance with contracts between Seller and a Governmental Unit or a private, non-Governmental Unit, contractor, subcontractor, or sub-subcontractor on the site of a real estate improvement or for direct delivery of material to the site of the improvement or, for specially fabricated materials off the site of the improvement for Seller's rendering of labor or services for improving real property in the ordinary course of Seller's business in order to make improvements to a building; erecting, placing, making, altering, removing, repairing, or demolishing any improvement over, upon, connected with, or beneath the surface of real property, or excavating any land, or furnishing materials for any of these purposes, or performing any labor or services upon the improvements, including the furnishing or carpet or rugs or appliances that are permanently affixed to the real property and final construction cleanup to prepare a structure for occupancy; or performing any labor or services or furnishing any materials in grading, seeding, sodding, or planting for landscaping purposes, including the furnishing of trees, shrubs, bushes, or plants that are planted on the real property, or in equipping any improvement with fixtures or permanent apparatus which have been duly offered for sale by Seller to Purchaser and approved for purchase by Purchaser at a discount.

1.2 **"Clearance Days"** - one (1) banking days for checks drawn on Texas banks; otherwise, two (2) days for out of state banks.

1.3 **"Closed"** - a Purchased Account is closed upon the first to occur of: (i) receipt of full payment by Purchaser or (ii) the unpaid Face Amount has been charged by Purchaser to the Reserve Account pursuant to the terms hereof.

1.4 **"Collateral"** - all Seller's now owned and hereafter acquired Accounts, Chattel Paper, Deposit Accounts, Inventory, Equipment, Instruments, Investment Property, Documents, Letter of Credit Rights, Commercial Tort Claims, General Intangibles, Supporting Obligations and any sums maintained by Purchaser that are identified as payable to Seller from the Reserve Account. As further collateral Seller hereby irrevocably assigns all of its right, title and interest in and to any rights that Seller has or may come to have against any real property and/or bond as well as the owner of real property, including all persons who own any legal or equitable interest in real property, which interest can be sold by legal process, and who enters into a contract for the improvement of the real property, including but not limited to, all accounts created as a result of Product furnished pursuant to and in compliance with a contract with an owner, contractor, subcontractor, or sub-subcontractor on the site of a real estate

_Initial_

# EXHIBIT 1

improvement or for the direct delivery of material to the site of the improvement or, for specially fabricated materials, off the site of the improvement.

1.5 **"Complete Termination"** – Complete Termination occurs upon satisfaction of each of the following conditions: payment in full of all Obligations of Seller to Purchaser and Purchaser's issuance of a UCC termination statement; if Purchaser has issued or caused to be issued any guaranty, promise, or letter of credit on behalf of Seller, acknowledgement from any beneficiaries thereof that Purchaser or any other issuer has no outstanding direct or contingent liability therein; and Seller has executed and delivered to Purchaser a general release in the form attached hereto.

1.6 **"Dispute"** or **"Disputed"** – any claim made in respect to a Payor against Seller or an Account, of any kind whatsoever, valid or invalid, that has or may have the effect of reducing or potentially reducing the amount of an Account owing to Purchaser or collectible from a Payor.

1.7 **"Early Termination Date"** – see Section 16 hereof.

1.8 **"Eligible Account"** - an Account that is acceptable for purchase as determined by Purchaser in the exercise of its reasonable sole credit or business judgment.

1.9 **"Event of Default"** – as defined herein.

1.10 **"Face Amount"** - the total gross amount due on an Account at the time of purchase.

1.11 **"Factoring Fee"** - the Factoring Fee Percentage multiplied by the Face Amount of a Purchased Account, for each Factoring Fee Period or portion thereof, that any portion thereof remains unpaid, computed from the end of the Initial Fee Period to and including the date on which a Purchased Account is Closed.

1.12 **"Factoring Fee Percentage"**: 5.0 %

1.13 **"Advance Rate"**- the percentage of the Face Amount of Purchased Accounts immediately available to the Seller pursuant to Schedule of Accounts

1.14 **"Advance Rate Percentage"**: 70 %

1.15 **"Factoring Fee Period"**: 30 days.

1.16 **"Invoice"** – any form of document that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

1.17 **"Late Charge"**: 1.25 percent per week.

1.18 **"Invoice Date"** Date listed on the invoice being sold

1.19 **"Late Payment Date"**: the date which is **30 days plus 1 day** from the Invoice date on a Purchased Account.

1.20 **"Minimum Monthly Fee"**: **N/A**

2


Initial

1.21 **"Misdirected Payment Fee"** - Fifteen percent (15%) of the amount of any payment (but in no event less than $1,000) on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the 2nd business day following the date of receipt by Seller, or 30% (but in no event less than $1,000) of the amount of any such payment which has been received by Seller as a result of any action taken by Seller to cause such payment to be made to Seller.

1.22 **"Notice of Assignment"** – any form of written notification, as required by Purchaser, that satisfies the requirements of 9-406(a) of the UCC.

1.23 **"Obligation(s)"** - all present and future obligations and liabilities owing by Seller to Purchaser, whether direct or indirect, absolute or contingent, including obligations and liabilities that are likely to become owing by Seller to Purchaser, whether arising hereunder or otherwise, and whether arising before, during or after the commencement of any case filed under title 11 of the United States Bankruptcy Code or any other debtor relief proceeding in which Seller is a Debtor.

1.24 **"Parties"** - Seller and Purchaser.

1.25 **"Payor"** – Seller's customer obligated to pay on an Account, an Account Debtor on an Account, or another obligor on an Account, including any person or entity making payment on an Account for the benefit (or for the account) of the Payor.

1.26 **"Purchase Date"** - the date on which Seller has been advised in writing that Purchaser has agreed to purchase an Account or in which Purchaser has caused a credit to be made to Seller's Reserve Account.

1.27 **"Purchase Price"** - the Face Amount of a Purchased Account less all Factoring Fees.

1.28 **"Purchased Accounts"** - Accounts purchased hereunder which have not been Closed.

1.29 **"Repurchased"** - an Account that has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount.

1.30 **"Required Reserve Amount"** - the Reserve Percentage multiplied by the unpaid balance of all Purchased Accounts.

1.31 **"Reserve Account"** - a bookkeeping account on the books of the Purchaser representing the portion of the Purchase Price which has not been paid by Purchaser to Seller, maintained by Purchaser to secure Seller's performance with the provisions hereof.

1.32 **"Reserve Percentage":** 30 %

1.33 **"Reserve Shortfall"** - the amount by which the Reserve Account is less than the Required Reserve Amount.

1.34 **"Schedule of Accounts"** or **"Schedule of Invoices"** - a form supplied by Purchaser from time to time wherein Seller lists such of its Accounts or Invoices as it requests that Purchaser purchase under the terms of this Agreement. The "Advance Cap" amount under a Schedule of Accounts or Schedule of Invoices is highest amount that Factor will advance to Seller on the Purchased Account or Accounts included on a Schedule of Accounts or Schedule of Invoices. Factor is not obligated to advance to Seller all of the Advance Cap under a Schedule of Accounts or Schedule of Invoices. If, in Factor's sole discretion after analyzing or investigating the Purchased Accounts included on a Schedule of Accounts or Schedule of Invoices, one or more of the Purchased Accounts included on the Schedule of Accounts or Schedule of Invoices is worth less than the value Factor attributed to the Account on the date of the Schedule of Accounts or Schedule of Invoices, Factor may advance less to Seller under the Schedule of Accounts or Schedule of Invoices than the Advance Cap under the Schedule of Accounts or Schedule of Invoices.

3

Initial

1.35 "Term" – A one year period.

1.36 "UCC" – The Uniform Commercial Code as adopted in the State of Texas.

## 2    Sale; Purchase Price; Billing

### 2.1.  Assignment and Sale.

2.1.1.    Seller may offer for sale to Purchaser in Bexar County, Texas, with full recourse, and as absolute owner, such of Seller's Accounts as are listed from time to time on Schedules of Accounts. The execution and delivery by Seller to Purchaser of a Schedule of Accounts or Invoices for one or more Purchased Accounts constitutes and effects Seller's sale, transfer, conveyance, and assignment to Purchaser with full recourse against Seller of the Accounts described on the Schedule of Accounts or Invoices. Seller remains liable to Purchaser for the total Face Amount of the Purchased Accounts in the event the Payors on the Purchased Accounts do not pay Purchaser on the Purchased Accounts. The execution and delivery by Seller to Purchaser of any Schedule of Accounts or Invoices is under and subject to this Agreement. All terms, promises, and conditions in this Agreement are fully incorporated into and part of each Schedule of Accounts or Invoices Seller executes and delivers to Purchaser as if all terms, promises, and conditions of this Agreement were fully stated in each such Schedule.

2.1.2. In addition to the sale, transfer, conveyance and assignment of the Accounts, Seller irrevocably assigns and contractually subrogates in favor of Purchaser all of its right, title and interest in and to any rights that Seller has or may come to have against any owner of real property, including all persons who own any legal or equitable interest in real property that is improved by the Seller's sale of Goods or services, which interest can be sold by legal process, and who enters into a contract for the improvement of the real property with such owner, including, but not limited to, any laborer or any other person commonly referred to as a lienor including subcontractor or sub-subcontractor. In addition, Seller assigns such other rights ancillary to the Purchased Accounts, including, but not limited to, any surety bonds and any guarantees.

2.1.3.    Each Purchaser of an Account by Purchaser hereunder shall be deemed to occur in Bexar County, Texas.

2.1.3.1 Each Schedule of Accounts or Schedule of Invoices shall be accompanied by such documentation supporting and evidencing each Account, as Purchaser shall from time to time request. Simultaneously with the submission of each Schedule of Accounts or Invoices that Seller submits to Factor (unless Factor issues a written waiver), unless waived in writing by Factor, Seller shall deliver each of the following as Purchaser may require for Purchaser's benefit:

2.1.3.2  A duly executed and notarized Assignment of Lien Rights, a form of which is attached hereto but which form may be modified from time to time as Factor may require;

2.1.3.3  A copy of a duly filed and recorded Notice of Commencement or similar form of construction lien law document;

2.1.3.4  A duly executed Joint Check Agreement as Factor may require. The Joint Check Agreement may also include such other terms and conditions as Factor, in its sole and exclusive discretion, may request, including, but not limited to, terms that the Construction Account shall not be subject to any charge back, offset or other defense from payment. Seller acknowledges that Factor's use of the Joint Check Agreement is not intended and shall not adversely impact or otherwise serve in any way as a waiver of or estoppel against Factor's right to the exclusive receipt of payments from account debtors as provided under the applicable provisions of the UCC as adopted by state law.

4

Initial

2.1.3.5  As to all non-bonded projects, a copy of a fully completed Notice to Owner or similar form of construction lien law document in whatever form is provided by applicable state law.

2.1.3.6  As to all privately owned property projects that are bonded or all publicly owned property projects, and when Seller is not in privity with the general contractor, a copy of a fully completed Notice to Contractor in whatever form is provided by applicable state law.

2.1.3.7  In respect to any jobsite located in the State of Texas, a sworn declaration that Seller is and has at all pertinent times been in compliance with Title 10, Chapter 162 of the Vernon's Texas Statutes or any similar trust fund law or statutory proscription.

2.2  Purchaser Not Obligated To Purchase Any Account.  Purchaser is entitled to analyze each Account Seller offers for sale to Purchaser, and in Purchaser's sole discretion (based entirely on Purchaser's interests and without regard to Seller's interests) to reject any Account that Seller offers to sell to Purchaser.  Purchaser may, but need not, purchase from Seller such Accounts as Purchaser determines to be Eligible Accounts.  Purchaser (based entirely on Purchaser's interests and without regard to Seller's interests) may elect not to Purchase the full Maximum Amount from Seller.  Purchaser may elect not to purchase any Account which will cause the unpaid balance of Purchased Accounts to exceed the Maximum Amount.  If Purchaser purchases Accounts in excess of the Maximum Amount, same shall have no adverse consequences to Purchaser.

2.3  Purchaser shall pay to Seller on the 1st business day following the Purchase Date the Purchase Price of any Purchased Account, less any amounts due to Purchaser from Seller.

2.4  **Billing.**  Purchaser may send a periodic statement to all Payors itemizing their account activity during the preceding billing period.  Purchaser has the right to instruct all Payors on Purchased Accounts to make payments exclusively and directly to Purchaser.

## 3.  Reserve Account.

3.1.  Seller shall pay to Purchaser on demand in Bexar County, Texas the amount of any Reserve Shortfall.

3.2.  Purchaser may pay to Seller up to three business days any amount by which the Reserve Account exceeds the Required Reserve Amount

3.3.  Purchaser may charge the Reserve Account with any Obligation.

3.4.  Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account.

3.5.  ~~Purchaser may retain the Reserve Account until Complete Termination.~~  JV - 05/18/21

5


Initial

4. **Fees and Expenses**. Seller shall pay to Purchaser at Purchaser's offices in Bexar County, Texas:

4.1. **Factoring Fee**. The Factoring Fee, for each Factoring Fee Period until (i) the Late Payment Date or (ii) the date on which a Purchased Account is Closed, whichever is earliest.

4.2. **Misdirected Payment Fee**. Any Misdirected Payment Fee immediately upon its accrual.

4.3. **Late Charge**. The Late Charge, on demand, on all past due amounts due from Seller to Purchaser hereunder.

4.4. **Out-of-pocket Expenses**. The reasonable out-of-pocket expenses directly incurred by Purchaser in the administration or enforcement of this Agreement or any other agreement that is executed between the parties such as wire transfer fees of $35.00, postage, search fees, travel expenses, and any fees for professional services incurred by Purchaser in reviewing, analyzing, or auditing Seller's books, records, and bank account statements relating to the Purchased Accounts

5. **Repurchase Of Accounts**. At any time and for any reason Purchaser is entitled to request that Seller repurchase any Purchased Account (or all Purchased Accounts) on which the Face Amount has not been paid to Purchaser. Seller promises to repurchase from Purchaser in Bexar County, Texas any Account that Purchaser has previously purchased from Seller on which any portion of the Face Amount of the Account has not been paid to Purchaser. For any Purchased Account for which Purchaser requests repurchase by Seller, Seller shall pay Purchaser in Bexar County, Texas within three (3) days of Purchaser's request (i) the portion of the Face Amount of the Account that Seller or the Payor on the Account has not already paid Purchaser plus (ii) all unpaid Factoring Fees due on the Account. Upon Purchaser's receipt of the total amount due for the repurchase of an Account Purchaser will assign the Account back over to Seller.

6. **Security Interest; Ownership of Accounts**.

6.1. In order to protect Purchaser's ownership interest in the Purchased Accounts and to secure Seller's performance of the Obligations, Seller grants to Purchaser a continuing first priority security interest in the Collateral. Seller acknowledges and agrees that Purchaser is entitled to file a form UCC-1 in or with such agencies Purchaser deems appropriate.

6.2. Seller confirms and acknowledges that it does business as a commercial enterprise and that this Agreement is intended to be an "account purchase transaction," as defined by Texas Finance Code §306.001(1) and pursuant to Texas Finance Code 306.103, it is conclusively established that no amount charged under this Agreement shall constitute interest. Seller further acknowledges that in accordance with 9-318 of the UCC, Seller will not retain any legal or equitable interest in any Purchased Account sold under this Agreement. Seller acknowledges and agrees that Seller's grant to Purchaser of Security interest in the Collateral does not in any way prejudice or diminish any of Purchaser's ownership rights in the Purchased Accounts; rather, Seller intends for its grant to Purchaser of the Security interest in the Collateral to protect Purchaser's ownership interest in the Purchased Accounts and to secure payment of Seller's Obligations. For avoidance of doubt, to the extent there is any conflict or uncertainty regarding Purchaser's rights or interest in any Purchased Account as to whether Purchaser owns the Purchased Account or holds only a Security interest in the Purchase Account, the conflict or uncertainty will be resolved conclusively in favor of Purchaser as the owner of the Purchased Account.

6

Initial

7.  **Authorization to Purchaser.**

7.1.  Seller irrevocably authorizes Purchaser, at Seller's expense, to exercise at any time any or all of the following powers until all of the Obligations have been paid in full:

7.1.1.  Receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all proceeds of any Collateral securing the Obligations or the proceeds thereof;

7.1.2.  Take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon Purchaser's Accounts;

7.1.3.  Pay any sums necessary to discharge any lien or encumbrance which is or may become senior to Purchaser's ownership rights in the Purchased Accounts or security interest in any other assets of Seller, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable;

7.1.4.  Notify any Payor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser;

7.1.5.  Communicate directly with Seller's Payors to, among other things, verify the amount and validity of any Account created or sold by Seller.

7.1.6.  File any UCC financing statements it deems necessary and appropriate.  And,

7.1.7.  And after an Event of Default:

7.1.7.1.  Change the address for delivery of mail to Seller and to receive and open mail addressed to Seller and to the extent mail appears to be unrelated to Purchaser's interests, make such mail available to Seller for pick-up or otherwise transfer such mail to Seller which duty to transfer such mail shall commence thirty (30) days after Purchaser first receives physical possession of Seller's mail; and

7.1.7.2.  Extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts and discharge or release any Payor without affecting any of the Obligations.

7.2.  Seller authorizes Purchaser to accept, endorse and deposit on behalf of Seller any checks tendered by a Payor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under §3-311 of the Uniform Commercial Code, or otherwise.

8.  **ACH Authorization**. In order to satisfy any of the Obligations, Seller authorizes Purchaser to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Seller.

9.  **Covenants By Seller.**

9.1.  After written notice by Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of its Accounts, (b) compromise or settle any of its Accounts for less than the full amount thereof, (c) release in whole or in part any Payor, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts.

7

Initial

9.2. From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all business premises of the Seller and where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral and Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom, without expense to Purchaser, as Purchaser may request. Purchaser may, without expense to Purchaser, use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties, upon written or verbal request, to promptly disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller and in respect thereto irrevocably waives any privilege that may otherwise preclude such production.

9.3. Before sending any Invoice to an Account Debtor, Seller shall mark same with a Notice of Assignment and a duty to pay Purchaser in the form and manner as may be required by Purchaser.

9.4. Seller shall pay when due all payroll, sale, use and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

9.5. Seller shall not create, incur, assume or permit to exist any ownership interests, Security Interest or any other form of lien upon or with respect to any of the assets in which Purchaser now or hereafter holds either an ownership interest in the Purchased Accounts or a Security Interest in the Collateral.

9.6. Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at lease such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with and with insurance companies acceptable to Purchaser in its sole discretion. Seller shall furnish to Purchaser: (a) upon written request, any and all information concerning such insurance carried; (b) as requested by Purchaser, lender loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty (30) day's prior written cancellation notice to Purchaser.

9.7. Seller shall turnover to Purchaser at its offices in Bexar County, Texas by no later than the second (2nd) banking day following the date of receipt by Seller any payment made by a Payor on account of a Purchased Account notwithstanding Seller's obligation to pay the Misdirected Payment Fee. During such period of time, Seller shall be Purchaser's agent and fiduciary for the limited and exclusive purpose of receipt and delivery of such payment.

9.8. Seller agrees to execute and deliver to Purchaser at Purchaser's offices in Bexar County, Texas, without delay, any document that Purchaser reasonably believes is necessary to protect Purchaser's interest in the Purchased Accounts or to perfect the assignment thereof including an Assignment of Lien Rights form and Joint Check Agreement.

9.9. Seller promises to provide to Purchaser at Purchaser's offices in Bexar County, Texas promptly upon Purchaser's request complete and candid accountings on the status of each Purchased Account and all of Seller's books and records relating to each Purchased Account, including genuine copies of all of Seller's written and electronic communications with Seller's Payors on all Purchased Accounts. Seller promises and acknowledges that, in communicating with its Payors on Purchased Accounts and in accounting to Purchaser on Purchased Accounts, Seller is an agent of and fiduciary to Purchaser.

8

Initial

**10.** **Account Disputes.** Seller shall notify Purchaser promptly of and, if and only if requested by Purchaser, assist in settling all Disputes concerning any Purchased Account. Purchaser may attempt to settle, compromise, or litigate any Dispute upon such terms, as Purchaser in its sole discretion may deem advisable, at Seller's risk and at Seller's sole expense.

**11.** **Representation and Warranties.** Seller and each of its principals represents and warrants to purchaser that:

11.1. It is fully authorized to enter into this Agreement and to perform hereunder.

11.2. This Agreement constitutes its legal, valid and binding obligation.

11.3. Seller is solvent and in good standing in the jurisdiction of its organization. And,

11.4. The Purchased Accounts are and will remain:

11.4.1. Bona fide existing obligations created by the complete and unconditional sale and delivery of goods or the rendition of services in the ordinary course of Seller's business;

11.4.2. Unconditionally owed and will be paid to Purchaser without defenses, Disputes, offsets, counterclaims, or rights of return or cancellation; and,

11.4.3. Transactions based on sales of goods or services by Seller to customers of Seller that are not, directly or indirectly, affiliated with Seller or in any way not "arms length" transactions.

11.5. Seller and each of its principals further warrant and represent to Purchaser that:

11.5.1 Seller has not received notice or otherwise learned of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Payor regarding Purchased Accounts;

11.5.2 Seller has filed all tax returns and required reports and is current on payment of all taxes, assessments, fees and other governmental charges;

11.5.3 Immediately prior to the execution and at the time of delivery of each Schedule of Account, Seller is the sole owner and holder of each of the Accounts described thereon and that upon Purchaser's acceptance of each Purchased Account; it shall become the sole owner of such Purchased Account(s);

11.5.4 No Purchased Account shall have been previously sold or transferred or be subject to any lien, encumbrance, security interest or other claim of any kind or nature;

11.5.5 Seller will not factor, sell, transfer, pledge or give a Security Interest in any of its Accounts to anyone other than Purchaser during the Term of this Agreement and there are and shall at no time be any notice of lien or financing statements now or hereafter on file in any public office covering any of Seller's Collateral except the notice of lien or financing statement or statements filed or to be filed in respect of this Agreement or those statements now on file that have been disclosed, in writing, by Seller to Purchaser; and

11.5.6 In no event shall the funds advanced or paid to Seller hereunder be used directly or indirectly for personal, family, household or agricultural purposes

9

Initial

11.6 Seller further represents and warrants to Purchaser that, as to each Purchased Account relating to a construction project, each of the following will be performed: Seller shall correctly and timely serve by certified mail, return receipt requested, on each entity as may be required by law a Notice to Owner and shall also include Factor as a recipient to whom a copy of such Notice to Owner was served. Seller shall timely and correctly record all applicable Claims of Lien in the public records of the county where each project to which the Seller's goods are to be used or installed is located and shall under no circumstances do so outside of ninety (90) days of Seller's final furnishing of its materials. Seller shall also use whatever form is provided by applicable state law and shall promptly have each Claim of Lien served by certified mail, return receipt requested on all applicable parties identified in the Notice of Commencement and as may otherwise be required by law. Seller shall deliver to Factor a copy of any Notice of Contest of Lien that Seller may receive regarding any Claim of Lien. Seller agrees to execute and deliver, without delay, any other document(s) or take any other action(s) reasonably requested by Factor to protect Factor's interest in the purchased accounts or to perfect the assignment thereof.

**12     Indemnification.** Seller promises and agrees unconditionally and irrevocably to defend and indemnify Purchaser against and save Purchaser harmless from any and all manner of suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), and any failure by Seller to perform or observe its obligations under this Agreement. Without limiting the foregoing in any way, Seller also promises agrees unconditionally and irrevocably to defend, indemnify, and hold Purchaser harmless from and against any claim against Purchaser by any Payor or any customer of Seller.

**13     No Right of Offset or Withholding Payment.** Seller hereby acknowledges, agrees, and promises that Seller will never offset or set off against (or withhold from) any amount Seller owes Purchaser for any amount Seller claims or contends Purchaser owes Seller.  Seller hereby unconditionally and irrevocably waives any right of offset or set off against or withholding from any amount Seller owes Purchaser for any amount Seller ever claims or contends Purchaser owes Seller.  In the event Seller claims or contends Purchaser owes Seller an amount which Purchaser has not paid Seller hereunder and which Purchaser declines voluntarily to pay to Seller, Seller must establish in a final judgment in a civil action (after exhaustion of any right of Purchaser to appeal) Seller's right to recover the amount from Purchaser.

**14     Default.**

14.1     **Events of Default.** Each of the following events will constitute an Event of Default hereunder: (a) Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser, or any warranty or representation contained herein proves to be false in any way, howsoever minor, (b) Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings, (c) any guarantor fails to perform or observe any of guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) any involuntary lien, garnishment, attachment or the like shall be issued against or shall attach to the Purchased Accounts, the Collateral or any portion thereof and the same is not released within five (5) days; (e) Seller suffers the entry against it of a final judgment for the payment of money in excess of $5,000.00, unless the same is discharged within ten (10) days after the date of entry thereof; (f) Seller shall have a federal, state or other form of tax lien filed against any of its properties, or shall fail to pay any federal, state or other form of tax when due, or shall fail to timely file any federal or state tax form as and when due; or (g) a material adverse change shall have occurred in Seller's financial conditions, business or operations.  For an Event of Default under section 14.1 (g), Purchaser has the right to declare such an Event of Default if, in Purchaser's reasonable belief based on information reasonably available to Purchaser, such a material adverse change has occurred.

10

14.2  **Additional Events of Default.** In addition to the Events of Default identified in Section 14.1, it also constitutes an Event of Default if Seller makes any misrepresentation (or omits disclosure of any material information) to Purchaser about any of the following in relation to a Purchased Account: (a) any amount due on a Purchased Account, (b) the date when payment is due on a Purchased Account, or (c) the obligation of the Payor(s) to pay the amount represented to be due and owing on a Purchased Account.

14.3  **Effect of Default.** Upon the occurrence of any Event of Default:

14.3.1 In addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable without notice.

14.3.2 The Late Charge shall accrue and is payable on demand on any Obligation not paid when due.

14.3.3 Purchaser shall be entitled to any form of equitable relief that may be appropriate without having to establish any inadequate remedy at law or other grounds other than to establish that its Collateral is subject to being improperly used, moved, dissipated or withheld from Purchaser.

14.3.4 Purchaser shall be entitled to freeze, debit and/or effect a set-off against any fund or account Seller may maintain with any Bank and so notify such bank without regard to any draft that may have been issued and have not cleared.

14.3.5 All of Seller's rights of access that may be made available to Seller to any online internet services that Purchaser may make available to Seller shall be provisional pending any curing of such Events of Default. During such period of time, Purchaser may limit or terminate Seller's access to Purchaser's online services. Seller acknowledges that the information Purchaser makes available to Seller constitutes and satisfies any duty to respond to a Request for an Accounting or Request regarding a Statement of Account that is referenced in § 9-210 of the UCC.

14.3.6. Pursuant to 9-603 of the UCC, the Parties acknowledge that Purchaser shall have no duty to undertake to collect any Account or Purchased Account including those in which Purchaser receives information from any Payor that a Dispute exists. In the event Purchaser undertakes to collect from or enforce an obligation of any Payor and ascertains that the possibility of collection is outweighed by the likely costs and expenses that will be incurred, Purchaser may at any such time cease any further collection efforts and such action shall be considered commercially reasonable. Before Seller may, under any circumstances, seek to hold Purchaser responsible for taking any action perceived to be commercially unreasonable, Seller shall be required to first notify Purchaser, in writing, of all reasons why Seller believes Purchaser has acted in any commercially unreasonable manner and advise Purchaser of the action that Seller believes Purchaser should take.

14.4  The maximum monetary amount of Seller's contractual Obligation to Purchaser is the total unpaid Face Amount on all Purchased Accounts plus any amount Seller owes Purchaser under Sections 4.4 or 19 of this Agreement.

14.5  Seller's sole remedy for any breach alleged to have been committed by Purchaser of any obligation or duty owed under the Agreement, any other agreement between Seller and Purchaser or any duty or obligation arising out of or related to this Agreement shall be limited to any amount in the Reserve Account at the time notice of such breach is first given to Purchaser, in writing. Under no circumstances shall Purchaser be liable for any incidental, special or consequential damages, including, but not limited to, lost profits, loss of goodwill or any other losses associated therewith, whether Purchaser did or did not have any reason to know of a loss that may result from any general or particular requirement of Seller.

11

Initial

**15 Amendment and Waiver.**

15.1 Only a writing signed by all parties hereto may serve to amend this Agreement. No failure or delay in exercising any right hereunder shall impair any such right that Purchaser may have, nor shall any waiver by Purchaser hereunder be deemed a waiver of any default or breach subsequently occurring. Purchaser's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Purchaser would otherwise have.

15.2 All construction lien rights that may be assigned or inure to the benefit of Purchaser in respect to any Purchased Account shall not constitute any obligation being assumed by Purchaser and it shall be in Purchaser's sole and exclusive discretion to elect whether to undertake any one or more of the following: (1) service of Notices to Owner, (2) service and recordation of Claims of Lien, (3) rights to demand copies of contract(s) and statement(s) of account, (4) rights to request copies of any governmental or private payment bond, and (5) rights to receive copies of any Notice of Contest of Lien, existence of bond, Notice of Lien Prohibition, Notice of Transfer Bond, Order to Show Cause, or the like.

**16 Termination; Effective Date.**

16.1    This Agreement will be effective on the date indicated in the introduction to this Agreement, shall continue for the Term, and shall be automatically extended for successive Terms unless Seller shall provide at least ninety (90) days prior written notice to Purchaser of its intention to terminate whereupon this Agreement shall terminate on the date set forth in said notice (an "Early Termination Date").

16.2    Seller may only terminate this Agreement as of the end of the next maturing Term.

16.3    Purchaser may terminate this Agreement by giving Seller at least thirty-day's (30) prior written notice of termination, whereupon this Agreement shall terminate on the earlier date of the date of termination or the end of the then current Term.

16.4    Upon termination, Seller shall pay the Obligations to Purchaser and Purchaser shall thereafter have no duty to purchase any Accounts from Seller. Notwithstanding termination, until Complete Termination, Seller shall remain obligated to tender all Accounts to Purchaser notwithstanding that Purchaser may thereafter determine that no Account qualifies as an Eligible Account.

**17    Severability.** In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and      the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or

**18    Relationship of Parties.** The relationship of the parties is a factoring relationship, with Seller as the seller of Accounts and Purchaser as the purchaser or factor of those Accounts. Seller shall, once purchased by Purchaser, no longer have any right, title or interest in and to any Purchased Account. Purchaser shall never have any obligation to do or to warrant any work or service by Seller to any Payor or to any customer of Seller, or to perform any warranty obligation of Seller to any Payor or any customer of Seller. It is the intent of the parties that Purchaser shall never have any obligation on or liability to any Payor or any customer of Seller for any contract, work, or service promised or undertaken by Seller to any Payor or customer of Seller. The parties are not partners, and have no partnership relationship. Seller is an agent and fiduciary of Purchaser in collecting Purchased Accounts for Purchaser and in accounting for and reporting on Purchased Accounts to Purchaser. Purchaser shall at no time be deemed to be or become an agent or fiduciary of the Seller.

12

Initial

**19 Attorneys' Fees.** Seller promises and agrees to reimburse Purchaser on demand for the actual amount of all costs and expenses, including attorneys' fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller.

**20   Factoring Policies and Rules.** Factor's written Factoring Policies and Rules are incorporated into and part of this Agreement.  In the event of any conflict between this Agreement and the Factoring Policies and Rules, this Agreement controls.

**21 Entire Agreement.** This written Agreement together with Factor's Factoring Policies and Rules contains all of the terms on which the parties have agreed.  There is no term, promise, representation, or consideration on which the parties have agreed not stated in writing in this Agreement.  No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this Agreement.  No course of dealing, course of performance or trade usage, and no parol evidence of any nature, shall be used to supplement or modify any terms of this Agreement.  Furthermore, the Parties acknowledge that there exists no contemporaneous oral agreement that served to induce either of the Parties to enter into this Agreement.

**22   Choice of Law.** This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Texas. This Factoring and Security Agreement is made and performable in Bexar County, Texas.  Venue for any dispute arising under this contract shall be in San Antonio, Bexar County, Texas.

**23   Jury Trial Waiver. THE PARTIES HERETO UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR LEGAL PROCEEDING OR ACTION IN WHICH ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION BASED ON, ARISING OUT OF, OR RELATED IN ANY WAY TO THIS AGREEMENT OR TO THE DEALINGS OF THE PARTIES HERETO IS ASSERTED, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION FOR WHICH A JURY IS HEREBY WAIVED SHALL BE DECIDED WITHOUT A JURY.**

**24   Assignment.** Purchaser may assign its rights and delegate its duties hereunder. Upon such assignment or delegation, Seller shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Purchaser.

IN WITNESS WHEREOF, the Parties have executed this agreement on the day and year first above written.

**SELLER:**

Wire-Tech Manufacturing Corporation / Amco

By:
**Signature**

Name: Carlos Michael Arteaga

Title: _PRESIDENT_

**PURCHASER:**

CR-FED, LLC

By:
**Signature**

Name: Fermin Rajunov

Title: President

13

Initial

## CONTINUING GUARANTY

This CONTINUING GUARANTY dated as of <u>05/18/2021</u>, is made by the entities or individuals which have signed below (individually or collectively, "Guarantor"), in favor of **CR-FED, LLC** ("Creditor").

FOR GOOD AND VALUABLE CONSIDERATION, and to induce Creditor to extend financial accommodations to Debtor (as defined below), Guarantor agrees as follows:

1. **DEFINITIONS AND CONSTRUCTION.** As used herein:

   1.1 "Acceptable Forums" – See Section 14 hereof.

   1.2 "Agreement" – This Guaranty and any amendments thereto.

   1.3 "Bankruptcy Code" – Title 11 of the United States Code.

   1.4 "Chosen State" – Texas.

   1.5 "Credit Documents" –

   1.5.1 That certain Factoring and Security Agreement dated <u>05/18/2021</u> between, *inter alia*, CR-FED, LLC and <u>Wire-Tech Manufacturing Corporation/Ancora Services Corporation.</u>, all documents executed in connection therewith, and all amendments or renewals to or of any of the foregoing, or any other document evidencing a Guaranteed Obligation.

   1.6 "Creditor" – See Preamble.

   1.7 "Debtor" <u>Wire-Tech Manufacturing Corporation/Ancora Services Corporation.</u> a <u>Texas Corp</u>, and all its successors-in-interest by operation of law or otherwise, including any Trustee (as defined in the Bankruptcy Code) or debtor-in-possession, and any successor-in-interest arising out of any merger or reorganization involving such entity, whether it is the surviving or the disappearing entity.

   1.8 "Guaranteed Obligations" –

   1.8.1 All present and future obligations of Debtor to Creditor, including but not limited to obligations arising out of the Credit Documents, including interest that, but for the filing of a petition under the Bankruptcy Code with respect to Debtor, would have accrued on any such obligations, and attorneys' fees.

   1.9 "Guarantor" – See Preamble.

2. **GUARANTY.**

   2.1 **Promise to Pay and Perform.** Guarantor unconditionally and irrevocably guarantees to Creditor at its offices in San Antonio, Bexar County, Texas the prompt payment and performance of the Guaranteed Obligations whether or not the Guaranteed Obligations are found to be invalid, illegal or unenforceable, this being a guaranty of payment and not a guaranty of collection.

2.2 **Cumulative Obligations.** The obligations hereunder are in addition to any other obligations of Guarantor under any other guaranties of the indebtedness or other obligations of Debtor or any other person at any time given to Creditor. This Agreement shall not affect or invalidate any such other guaranties.

2.3 **Continuing Guaranty.** This Agreement shall remain in full force and effect notwithstanding the fact that, at any particular time, no Guaranteed Obligations may be outstanding.

2.4 **Joint and Several Obligation; Independent Obligation.** Guarantor is directly, jointly, and severally with all other guarantors of the Guaranteed Obligations liable to Creditor. The obligations of Guarantor hereunder are direct and primary and are independent of the obligations of Debtor or any other such guarantor, and a separate action may be brought against Guarantor irrespective of whether an action is brought against Debtor or any other guarantor or whether Debtor or any such other guarantor is joined in such action. Guarantor's liability hereunder shall not be contingent upon the exercise or enforcement by Creditor of any remedies it may have against Debtor or any other guarantor or the enforcement of any lien or realization upon any security Creditor may at any time possess. Any release that may be given by Creditor to Debtor or any other guarantor shall not release Guarantor.

3. **COVENANTS.**

3.1 Guarantor shall keep informed of Debtor's financial condition as well as all other circumstances that bear upon the risk of nonpayment of the Guaranteed Obligations.

3.2 Guarantor shall, from time to time, at the expense of Guarantor, promptly execute and deliver all further documents and take all further action that may be necessary, or that Creditor may reasonably request, to enable Creditor to exercise and enforce its rights and remedies hereunder.

3.3 Guarantor shall not create, incur, assume or permit to exist any non-purchase- money lien upon or with respect to any of its assets. Guarantor authorizes Creditor to record a record in any public records filing office advising third parties that the taking of any such lien by them may constitute the tortuous interference with Creditor's rights hereunder.

4. **PAYMENTS.**

4.1 **Nature and Application of Payments.** Creditor may apply any payment with respect to the Guaranteed Obligations or any other amounts due hereunder in such order, as Creditor shall in its sole and absolute discretion determine, irrespective of any contrary instructions received from any other person.

4.2 **Indefeasible Payment; Revival.** If any portion of any payment to Creditor hereunder is set aside and repaid by Creditor for any reason after being made by Guarantor, the amount so set aside shall be revived as a Guaranteed Obligation and

Guarantor shall be liable for the full amount Creditor is required to repay plus all costs and expenses (including attorneys' fees, costs, and expenses) incurred by Creditor in connection therewith.

4.3      **ACH Authorization.** In order to satisfy any of the Guaranteed Obligations, Guarantor authorizes Creditor to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Guarantor.

5.      **REPRESENTATIONS AND WARRANTIES.**

5.1      Guarantor represents and warrants as follows (which representations and warranties shall be true, correct, and complete at all times):

5.1.1   This Agreement is not made by Guarantor in reliance on any representation or warranty, express or implied, by Creditor concerning the financial condition of Debtor, the nature, value, or extent of any security for the Guaranteed Obligations, or any other matter, and no promises have been made to Guarantor by any person to induce Guarantor to enter into this Agreement, except as set forth in this Agreement. Guarantor is presently informed of the financial condition of Debtor and of all other circumstances that a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Guaranteed Obligations.

5.1.2   The consideration received by Guarantor in connection with this Agreement is adequate and satisfactory in all respects, and represents reasonably equivalent value, to support this Agreement and Guarantor's obligations hereunder.

5.1.3   With respect to any Guarantor which is not a natural person, it:

(a)      Is organized, validly existing, and in good standing under the laws of the jurisdiction of its formation;

(b)      Has the power and authority and all governmental licenses, authorizations, consents, and approvals to execute, deliver, and perform its obligations hereunder;

(c)      This Agreement has been authorized by all necessary action by Guarantor, and does not and will not:

(i)      Contravene the terms of Guarantor's organizational

(ii)      Conflict with or result in any breach or contravention of, any contractual obligation to which Guarantor is a party or any order, injunction, writ, or decree of any governmental authority to which Guarantor or Guarantor's properties are subject; or governmental authority.

(iii)      Violate any law, rule, or regulation.

5.1.4   There are no actions, suits, proceedings, claims, or disputes pending, or, to the best knowledge of Guarantor, threatened or contemplated, at law, in equity, in arbitration, or before any governmental authority, against Guarantor or any of Guarantor's properties which purport to affect or pertain to this Agreement or any of the transactions contemplated hereby or thereby.

6.   **WAIVERS.** Guarantor waives:

6.1   ANY AND ALL SURETYSHIP DEFENSES, WHETHER ARISING BY CONTRACT, STATUTE OR BY OPERATION OF LAW.

6.2   Notice of (a) any adverse change in the financial condition of any Debtor, (b) any default in the performance of the Guaranteed Obligations; and (c) any other notice to which Guarantor might be entitled.

6.3   Any defense or claim arising out of (a) the release of any collateral securing the Guaranteed Obligations or (b) any fact that may increase Guarantor's risk hereunder.

6.4   Any claim of usury.

6.5   Any other defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations have been fully paid) of Debtor including any defense arising from any statute of limitations.

6.6   Any defense based on the invalidity, irregularity, or unenforceability of all or any part of the Guaranteed Obligations or any other circumstance which might constitute a defense of a guarantor.

6.7   Any claim or defense based on (a) the validity, legality or enforceability in whole or in part of the Guaranteed Obligations, (b) any assignment, amendment, transfer, modification, renewal, waiver, compromise, addition or supplement relating to Guaranteed Obligations, (c) any setoff, counterclaim or any circumstances which might constitute a defense or discharge of Guarantor.

6.8   Any lack of power or authority of Debtor.

6.9   Any defense to payment hereunder resulting from Creditor's releasing the Debtor or any other obligor owing the Guaranteed Obligations from their obligation to pay the Guaranteed Obligations, as well as Creditor's failure to give Guarantor notice thereof.

6.10   All Guarantor's rights of reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to Guarantor.

6.11   All rights and defenses arising out of an election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the Debtor.

7.   **ACKNOWLEDGEMENTS AND AGREEMENTS.**

7.1    **Modifications to Credit Documents and Guaranteed Obligations.** Without notice to Guarantor and without affecting or impairing the obligations of Guarantor hereunder, Creditor may, compromise or settle, extend the period of duration or the time for the payment, or discharge the performance of, or may refuse to, or otherwise not enforce, or may, release any obligor of the Guaranteed Obligations or may grant other indulgences to Debtor in respect thereof, or may amend the Credit Documents, or may enforce, exchange, release, or waive any security for the Guaranteed Obligations or any guaranty of the Guaranteed Obligations.

7.2    **Subordination.** All present and future indebtedness of Debtor to Guarantor is subordinated to the payment of the Guaranteed Obligations. In this regard, no payment of any kind whatsoever shall be made with respect to such indebtedness until the Guaranteed Obligations have been indefeasibly paid in full. Any payment received by Guarantor in respect of such indebtedness shall be held by Guarantor as trustee for Creditor, and promptly paid over to Creditor on account of the Guaranteed Obligations but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Agreement. Upon request by Creditor, any notes or other instruments now or hereafter evidencing such indebtedness of Debtor to Guarantor, shall be marked with a legend that the same are subject to this Agreement or shall be delivered to Creditor for safekeeping.

7.3    **No Defense to Obligation to Pay.** Guarantor acknowledges and agrees that Guarantor is unconditionally obligated to pay Creditor the Guaranteed Obligations and that Guarantor has no defense to Guarantor's liability under this Continuing Guaranty.

8.    **AMENDMENT AND WAIVER.**

8.1    Only a writing signed by all parties hereto may amend this Agreement. No failure or delay in exercising any right hereunder shall impair any such right that Creditor may have, nor shall any waiver by Creditor hereunder be deemed a waiver of any default or breach subsequently occurring. Creditor's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Creditor would otherwise have.

9.    **COSTS AND EXPENSES.**

9.1    Guarantor agrees to reimburse Creditor on demand for the actual costs including:

9.1.1    Attorneys' fees, which Creditor has incurred or may incur in enforcing this Agreement or in connection with any federal or state insolvency proceeding commenced by or against Guarantor, including those (a) arising out of the automatic stay, (b) seeking dismissal or conversion of the bankruptcy proceeding or (c) opposing confirmation of Guarantor's plan thereunder.

9.1.2    Photocopying (which, if performed by Creditor's employees, shall be at the rate of $.10/page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Guarantor is a party.

10.    **SUCCESSORS AND ASSIGNS.**

10.1    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

10.2    Creditor may assign its rights and delegate its duties hereunder in connection with an

assignment of the Guaranteed Obligations. Upon such assignment, Guarantor shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Creditor.

11. **ENTIRE AGREEMENT.**

11.1    No promises of any kind have been made by Creditor or any third party to induce Guarantor to execute this Agreement. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

12. **NO RIGHT TO REVOKE.**

12.1    Guarantor waives any right to revoke the Agreement as to Guaranteed Obligations.

12.2    If, contrary to the express intent of this agreement, any such revocation is attempted by Guarantor:

12.2.1   It shall not be effective until thirty days after written notice thereof has been actually received by any officer of Creditor;

12.2.2   It shall not apply to any Guaranteed Obligations in existence on such date (including any subsequent continuation, extension, or renewal thereof);

12.2.3   It shall not apply to any Guaranteed Obligations made or created after such date pursuant to a commitment of Creditor which was, or is believed in good faith by Creditor to be, in existence on the date of such revocation;

12.2.4   No payment by any other guarantor or Debtor, or from any other source, prior to the date of such revocation shall reduce the obligations of Guarantor hereunder; and

12.2.5   Payment by any other Guarantor or Debtor, or from any other source shall be first applied to Guaranteed Obligations, if any, as to which the revocation by Guarantor is effective and, to the extent so applied, shall not reduce the obligations of Guarantor hereunder.

13. **CHOICE OF LAW.**

13.1    This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

14. **VENUE; JURISDICTION.**

14.1    Guarantor consents and submits to the personal jurisdiction of the Courts of the chosen state for any action by Creditor for enforcement or interpretation of this continuing Guaranty. Exclusive venue for any action for the interpretation and enforcement of this Continuing Guaranty is in a court of proper jurisdiction in Bexar County, Texas where this Continuing Guaranty is performable.

15.    **JURY WAIVER.**

15.1    **Guarantor hereby unconditionally and irrevocably waives the right to a jury trial in or for any lawsuit or legal proceeding based on, arising out of, or related to this Continuing Guaranty. In any trial in any such lawsuit or legal proceeding the judge shall be the trier of fact without a jury.**

_____
Guarantors Initials

IN WITNESS WHEREOF, Guarantor has executed this Agreement as of the date first written above.

_____
Signature

CARLOS M. ARTEAGA
_____
Name

State of  Texas    §

County of  Bexar    §

On this  10  day of  May  , 20 7 , before me personally appeared  Carlos M. Arteaga  , whose identity was proven to me on the basis of satisfactory evidence to be the person who he or she claims to be, and acknowledged that he or she signed the above/attached document.

_____
Notary Public - Texas

JONATAN VEGA RODRIGUEZ
Notary Public, State of Texas
Comm. Expires 03-30-2025
Notary ID 131054320

Page 7 of 7

## AGREEMENT ADDENDUM

### Acknowledgement Understanding Regarding
### Prohibition of Third Party Loans and Financing

Seller acknowledges that it understands and agrees that it is a specific *act of material default* to apply for or receive any Merchant Cash Advance Loan ("MCA Loan"), Business Builder Loan, or other form of secured financing. Under **NO** circumstances shall Seller apply for or receive any form of financing other than that from **Credito Real USA**. Seller acknowledges and agrees it will not at any time pledge any of its collateral to any party other than **Credito Real USA** without the specific, written permission of Purchaser.

Seller intends to be bound by all terms, conditions, penalties and charges in the attached Agreement should it secure any form of secured financing from a third party.

Seller understands the complete prohibition of receiving any financing from a third party.

Seller will contact Purchaser and only Purchaser if it has any reason to discuss additional financing.

**SELLER NAME:** _WIRE-TECH MFG. CORP._

**By:** _____
Signature

**Title:** _PRESIDENT_

**Date:** _5/19/21_

# CR-FED, LLC Factoring Policies and Rules

We (below meaning both _WIRETECH MFG CORP_, "Seller" under the Factoring and Security Agreement, and _ANCORR SERVICES Corp_, "Guarantor" under the Continuing Guaranty) understand and acknowledge that the following policies and rules of CR-FED, LLC (below "Factor") are required to keep the Factoring and Security Agreement with Factor in good standing and that any failure to meet any of the below items may constitute a breach of the Factoring and Security Agreement and Guaranty and may lead to Seller and Guarantor owing additional damages to Factor.

- Factor is purchasing invoices or accounts receivables from Seller.  Factor is not loaning money to Seller.

- We owe Factor the total unpaid amount of the factored invoices sold to Factor, which is more than the amount of money Factor has advanced to Seller.

- As Guarantor, I am personally liable for all monies Seller owes Factor.  I understand that if Seller does not pay Factor any amount owed to Factor, then Factor can and probably will sue me personally to collect the money Seller owes Factor.

- When we receive payments from our clients or project owners on any factored invoice or receivable, the money belongs to Factor.  We are fiduciaries to Factor in accounting for that money and paying it over to Factor.

- We will not cash or keep any checks or payments on any factored receivables or invoices. We must immediately notify and deliver to Factor any money we receive on any factored invoice or receivable.

- We will immediately notify Factor of any change in the status or condition of any factored invoice or receivable. It is extremely important to notify Factor immediately of any issue that may delay payment or reduce the amount of expected payment on any factored receivable or invoice.

- Any factored invoice or receivable will be for a valid invoice for completed work that is approved and scheduled to be paid according to contract with Seller's customer. We will not factor any invoice or receivable on any job where Seller is in poor standing or has any issue that could hinder payment.

- We must notify Factor immediately of any 3rd party or vendor payments that we are responsible for that may impact the timing or amount of payment due for a factored invoice.

- Factor may advance less than the Advance Cap amount on a Schedule of Invoices if Factor determines that a factored invoice or receivable is worth less than Factor previously believed at the time of the Schedule of Invoices.

- We will be proactive in communicating with Factor and will always be available to come to Factor's office to proactively manage our account, address any concerns, and make arrangements to get our account with Factor current as quickly as possible.

- Factor may contact our customers and project owners at any time to verify the status and validity of any factored invoice. We will actively facilitate communications between Factor and our customers so Factor will know the status of payment on any factored invoice and receivable.

- Our failure to communicate with Factor or to provide reasonable status updates to Factor on the status of payment on any factored invoice may cause Factor to take legal action against us.

Seller:

By: _____

Printed Name: _CARLOS ARTEAGA_

Title: President

Date: _5/19/21_

Guarantor:

By: _____

Printed Name: _ANCORR SERVICES CORPORATION_

Date: _5/19/21_

**PLEASE INTIAL EACH BULLET POINT IN SPACE PROVIDED**